Filed 7/14/26; Certified for Publication 8/6/26 CA3

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

| | |
|---|---|
| EMPLOYERS PREFERRED INSURANCE COMPANY,<br>　　　　Petitioner,<br><br>　　　　v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and PURCHASE GREEN ARTIFICIAL GRASS,<br>　　　　Respondents. | C104263<br><br>(WCAB Case No. ADJ16338449) |

Petitioner Employers Preferred Insurance Company (insurance company) provided a workers' compensation insurance policy to respondent Purchase Green Artificial Grass (insured). Consistent with Insurance Code[1] section 676.8, the policy permitted insurance company to cancel the policy if insured "[f]ail[ed] to permit [insurance company] to audit payroll." (See § 676.8, subd. (b)(2).) Insured did not respond to insurance company's multiple requests over a more than three-month period to provide payroll records to permit insurance company to calculate the final premium; insurance company consequently cancelled the in-force policy. An employee of insured subsequently submitted a workers' compensation claim to insurance company, who denied the claim due to the policy's cancellation. Respondent the Workers' Compensation Appeals Board (Board) eventually determined the cancellation was invalid because neither the policy nor

___

[1]　　　Further undesignated section references are to the Insurance Code.

1

the Insurance Code sufficiently defined what it means to fail to permit an audit to justify insurance company's cancellation. Insurance company filed a petition for writ of review with this court challenging the Board's determination and we issued the writ.

We annul the Board's order because insured's failure to respond to insurance company's requests constituted a failure to permit the audit of its payroll under the applicable policy.

FACTUAL AND PROCEDURAL BACKGROUND

Insurance company provided insured workers' compensation insurance policies. One policy was set to expire on May 5, 2021 (2020 policy),[2] and on March 31, 2021, insurance company issued an additional renewal policy to provide workers' compensation insurance for the period of May 5, 2021, to May 5, 2022 (2021 policy).

The 2021 policy stated the premium listed was "an estimate" and the "final premium will be determined after this policy ends by using actual" payroll data. To support this calculation the policy had a records provision and two audit provisions. The records provision stated: "You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them."

The first audit provision required: "You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours

---

[2]     The 2020 policy is not in the record. Insurance company does not provide a citation to the record for this policy and insured cites to its arbitration brief that mentions the policy without providing it. The only relevant detail of the 2020 policy for this matter is that it expired on May 5, 2021, to which the parties agree. We consequently assume the 2020 policy expired on May 5, 2021. (*Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175, fn. 3 ["where the parties agree, we accept their agreed facts as mutual concessions"].)

2

during the policy period and within three years after the policy period ends.  Information developed by audit will be used to determine final premium."

The second and main audit provision was titled "Optional Premium Increase Endorsement – California."  (Some capitalization and boldface omitted.)  This section, in its entirety, stated:  "You must provide us, or our authorized representative, access to records necessary to perform a payroll verification audit.  If you fail to provide access within 90 days after expiration of the policy, you are liable to pay a total premium equal to [three] times our current estimate of the annual premium for your policy.  In addition, if you fail to provide access after our third request within a 90 day or longer period, you are also liable for our costs in attempting to perform the audit unless you provide a compelling business reason for your failure.  [¶]  We will contact you to schedule appointments during normal business hours.  [¶]  We will notify you of your failure to provide access by mailing a certified, return-receipt document stating the increased premium and the total amount of our costs incurred in our attempt(s) to perform an audit.  In addition to any other obligations under this contract, 30 days after you receive the notification, you will be obligated to pay the total premium and costs referenced above.  If, thereafter, you provide access to your records within three years after the policy expires, or within another mutually agreed upon time, and we succeed in performing the audit to our satisfaction, we will revise your total premium and the costs due to reflect the results of the audit."

The 2021 policy's cancellation term stated the insurance company "may cancel this policy for one or more of the following reasons," including a "[f]ailure to permit [insurance company] to audit payroll as required by the terms of this policy or a previous policy issued."  If insurance company cancels the policy for this reason, it "will give [insured] 10 days advance written notice, stating when the cancelation is to take effect."

When the 2020 policy expired, insurance company sent several communications to insured requesting payroll records to perform an audit to calculate the final premium of

the 2020 policy:  a letter and e-mail on May 5, 2021; a letter and e-mail on May 27, 2021; a letter and e-mail on June 7, 2021; and a certified letter and e-mail on August 5, 2021, and the letter was delivered on August 10, 2021.  Insurance company also sent a notice of cancellation on August 5, 2021, stating cancellation of the 2021 policy would become effective on September 14, 2021, because of a "failure to cooperate with a final audit and permit the insurer to audit payroll."  (Capitalization omitted.)  The notice provided a phone number to comply and noted the policy is not subject to reinstatement if it is cancelled.

On August 26, 2021, insurance company sent a letter to insured stating its "final audit was deemed non-compliant" and added a "non-compliance" charge.  This charge would be dropped if insured "fully cooperate[d] with the audit process," otherwise failure to comply "may result in cancellation of [its] current policy (if any)."

After September 2021, insurance company then sent insured multiple final premium audit requests for the 2021 policy with the stated coverage period being from May 5, 2021, through September 14, 2021.  After these requests, insurance company e-mailed insured on January 19, 2022, stating the final premium audit for the 2021 policy was noncompliant.  Insurance company also sent a letter on February 8, 2022, stating the audit was noncompliant, but this letter stated the policy period was through May 5, 2022.

On February 3, 2022, an employee of insured was injured and filed a workers' compensation claim with insurance company.  Insured paid the final premium charges for both the 2020 policy and 2021 policy on February 18, 2022.  In May 2022, insurance company denied the claim, stating the 2021 policy was cancelled on September 14, 2021.

The claim went to arbitration under the Board and the arbitrator issued a written opinion on February 25, 2025, concluding the 2021 policy "was not effectively cancelled on September 14, 2021, by the notice of cancellation issued, dated August 5, 2021." Insurance company filed a petition for reconsideration with the Board.

4

On March 28, 2025, the arbitrator issued a report and recommendation on the petition for reconsideration recommending the Board deny the petition. The arbitrator noted insured's owner testified he was "aware of the requirement for an audit of his payroll" but "[h]e did not remember receiving letters or e-mails from the carrier requesting documents [it] wanted to complete the audit for the 2020 policy year. He also did not remember receiving the notice of cancellation dated August 5, 2021."

The arbitrator then affirmed his original analysis finding the policy has audit provisions but "[n]owhere in the terms of the policy is there a definition of what actions on the part of the employer constitute a failure to permit the carrier to audit the payroll." Nor is there a definition for failing to permit an audit in the Insurance Code. Section 11760.1 permits an audit penalty if the employer fails to provide records access, but the arbitrator found, "The penalty would be refundable once the employer provides the requested records to the carrier and allows the audit to be completed." The arbitrator further found section 676.8, the cancellation notice statute, "does not provide a definition of failure to permit an audit by the carrier." The arbitrator believed cancelling the policy "should require more on the part of the carrier to prove that the policy holder had failed to permit them to audit payroll.… [¶] … The 'failure to permit language' and the final and irrevocable cancellation of the policy supports a finding that something more than no response to the three final notices and the passage of a 90 day period would give the carrier the right to cancel the policy, as is required in … [s]ection 11760.1." Thus, the arbitrator concluded, "Based on the above analysis, it is recommended that the [insurance company's] [p]etition for [r]econsideration be denied because of ineffective notice of cancellation."

On June 13, 2025, the Board adopted the recommendation and denied the petition for reconsideration.

Insurance company filed a petition for writ of review with this court challenging the Board's decision. We issued the writ of review on February 20, 2026.

5

Insurance company's central contention is the arbitrator, and by extension the Board, erred by finding the 2021 policy and the Insurance Code did not permit it to cancel the policy given insured's failure to assist in the premium audit. Insured does not address the interpretation of this provision, instead asserting several other reasons for the policy cancellation being invalid. We first address the interpretation and agree with insurance company that insured failed to permit the audit of the final premium for the 2020 policy, justifying cancellation of the 2021 policy. We then consider and reject insured's secondary arguments.

## I

### *Insurance Company's Cancellation Notice Was Effective*

Insurance company contends the 2021 policy complied with the law and "[n]othing more is required by the regulatory scheme or the policy terms. The [Board] cannot impose any additional duties on [insurance company] or any other insurer." Insurance company also contends its cancellation of the 2021 policy was permissible under the terms of the agreement and the Board's interpretation to the contrary violates rules of contract interpretation. We agree the Board erred.

### A

### *Legal Standards*

"[I]nsurance contracts … are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) " '[W]e apply de novo review, exercising our independent judgment as to the meaning of the' [insurance policy] because '[i]t is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence.… We are guided by the well-settled rules of interpretation of a contract, endeavoring to effectuate the mutual intent of the parties as it existed at the time of contracting insofar as it is ascertainable and lawful.' [Citation.] [¶] In interpreting the

6

[insurance policy], the following principles of contract interpretation are of particular significance: ' "A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone." ' " (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 797-798.) In short, "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) "Thus, in interpreting the [insurance policy], we are not concerned as much with what the parties might tell us they meant by the words they used as with how a reasonable person would interpret those words." (*Quantification Settlement Agreement Cases*, at p. 798, boldface omitted.)

Section 676.8 states a "notice of cancellation shall not be effective" for a workers' compensation insurance policy unless it complies with one of several enumerated conditions. (§ 676.8, subds. (a)-(b).) One condition is "[t]he policyholder's failure to report payroll, *to permit the insurer to audit payroll as required by the terms of the policy or of a previous policy issued by the insurer*, or to pay any additional premium as a result of an audit of payroll as required by the terms of the policy or of a previous policy." (§ 676.8, subd. (b)(2).) Under this condition, a "policy shall not be canceled … except upon 10 days' written notice." (§ 676.8, subd. (c).)

Section 11760.1, subdivision (a) permits collection of a premium penalty should an insurer fail to provide access to payroll records. Specifically, "[i]f an employer fails to provide for access … to its records … the employer shall be liable to pay to the insurer a total premium for the policy equal to three times the insurer's then-current estimate of the annual premium on the expiration date of the policy. The employer shall also be liable, in addition to the premium, for costs incurred by the insurer in its attempts to perform an audit, after the insured has failed upon the insurer's third request during at least a 90-day

7

period to provide access, and the insured has provided no compelling business reason for the failure." (*Ibid*.) The premium and costs "shall be fully enforceable and executable" 30 days after delivery of a certified letter sent after "the employer's failure to provide access after the insurer's third request during at least a 90-day period." (§ 11760.1, subd. (d).) If the employer later provides access, "and if the insurer then succeeds in performing the audit to its satisfaction, the insurer shall revise the total premium and costs payable for the policy by the employer to reflect the results of its audit." (§ 11760.1, subd. (e).) Access is defined as "any time during regular business hours … within three years after the policy period ends." (§ 11760.1, subd. (b).)

## B

### *Insured Failed To Permit Insurance Company's Audit*

For a notice of cancellation to be effective, section 676.8 permits the terms of the policy to dictate whether the insured has failed to permit the insurer to audit payroll. (§ 676.8, subd. (b)(2).) Thus, the question presented is whether insured's failure to respond to any of insurance company's correspondences constituted a "[f]ailure to permit [insurance company] to audit payroll" under the 2021 policy's cancellation term.

The 2021 policy's language indicates the parties intended to require insurance company to perform an audit to calculate insured's final premium based on information insured provides. There were two terms in the policy about the audit, and they required insurance company to "examine and audit all" of insured's records and that insured "must provide [insurance company] … access to records necessary to perform a payroll verification audit." The records term required insured to keep records "needed to compute premium" and to then "provide [insurance company] with copies of those records when [insurance company] ask[ed] for them." The main audit term then provided for penalties and costs for failing to provide the payroll records. The record and audit terms establish the parties understood insurance company could not complete the final

8

audit without documents from insured.  Insured therefore had an affirmative obligation to supply information to insurance company for it to complete its duties.

The 2021 policy's main audit provision lays out several time periods.  This provision gives 90 days to respond before a premium penalty is charged, a "90 day or longer period" before costs are added, 30 days after receiving a certified letter insured is obligated to pay the total premium and costs, and then three years after expiration to provide records to perform the audit satisfactorily and revise the premium to the results of that audit.  The arbitrator was correct that nowhere in this main audit provision, nor in section 11760.1, is the language used in the cancellation term, "[f]ailure to permit [insurance company] to audit payroll," precisely defined for any of these periods.  Insurance company argues the failure arises at 90 days with the right to charge the premium penalty after the three sets of notifications.  But after 90 days the insured can "provide a compelling business reason for [its] failure," and the penalty and costs are not finalized until 30 days after the certified letter, indicating a narrow window to avoid failure after 90 days.

Lacking a definition for a failure to permit an audit is ultimately not determinative here.  Reasonableness is key:  We must interpret the agreement reasonably.  (Civ. Code, § 1643 ["A contract must receive such an interpretation as will make it … reasonable"]; *Quantification Settlement Agreement Cases*, *supra*, 201 Cal.App.4th at p. 798 [courts are concerned with "how a reasonable person would interpret" contractual terms].)  The 2021 policy imposed a clear obligation for insured to provide records when insurance company requested them and the word "fail" is used throughout the main audit provision if insured does not provide the records:  "[i]f you fail to provide access within 90 days," "if you fail to provide access after our third request," and "unless you provide a compelling business reason for your failure."  Most significantly the main audit provision also states:  "We will notify you of your *failure to provide access* by mailing a certified, return-receipt document."  (Italics added.)  Even though the precise wording "[f]ailure to permit

9

[insurance company] to audit payroll" is never used, the only reasonable interpretation from this language is that the main audit provision was intended by the parties to describe such a failure justifying cancellation.

The parties intended to deem a failure to permit the audit by at least the close of the certified letter period. The certified letter portion is the last reasonable marker of failure because it is a notification to insured of its "failure to provide access" and 30 days later insured becomes "obligated to pay the total premium and costs." There is finality in this portion of the main audit provision. While there is also a three-year deadline to provide access to the records, there is no language in this portion of the main audit provision indicating this type of access years later could avoid a "failure" like the "compelling business reason" language. Further, given the policy's one-year term, the main audit provision requiring access within 90 days and three requests for access before a substantial penalty would be imposed, and a notification of a "failure to provide access" through certified letter, it would be unreasonable to conclude the parties intended to allow insured an additional 1,000 days[3] before insurance company could cancel a subsequent one-year policy.

Insurance company satisfied this timeline. Insurance company sent three sets of e-mails and letters to insured for access to its payroll records and a certified letter on August 5, 2021, which was 92 days after expiration of the 2020 policy. The 2021 policy was cancelled on September 14, 2021, which was 35 days after August 10, 2021, when insured received the certified letter. Insured did not provide payroll documents within this time nor contend it had a compelling business reason for failing to provide payroll

---

[3] Three years minus 90 days is 1,005 days.

10

records—its owner simply did not remember getting the communications.[4]  Insurance company's cancellations therefore satisfied the terms of the 2021 policy and consequently section 676.8.

The arbitrator's legal reasoning missed the forest for the trees.  Not every word or phrase must be precisely defined in an agreement.  (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866 ["any rule that rigidly presumed ambiguity from the absence of a definition would be illogical and unworkable"].)  And " '[c]ourts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.' " (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1180.)  The arbitrator's focus on finding the precise language of the cancellation term failed to consider the entirety of the main audit provision against the insured's complete failure to permit an audit under any reasonable interpretation of the agreement.

Ultimately, insurance company followed all requirements in the main audit provision by sending numerous communications over three months, including a certified letter and a notification of cancellation over a month in the future.  Insured failed to provide the necessary payroll records during this period for insurance company to complete the audit.  Thus, by September 14, 2021, all reasonable deadlines had been surpassed under the 2021 policy and the policy unambiguously permitted insurance company to cancel the policy due to insured's unresponsiveness.  The arbitrator, and consequently the Board, erred in concluding otherwise.

---

[4]    Insured mentions in its brief it was in the process of moving offices in the summer of 2021.  But insured never asserts this qualified as a compelling business reason under section 11760.1 or the 2021 policy for failing to respond to all of insurance company's communications.  Insured has therefore forfeited any argument that it was a compelling business reason. (*Aton Center, Inc. v. United Healthcare Ins. Co.* (2023) 93 Cal.App.5th 1214, 1238 [undeveloped arguments are forfeited on appeal].)

## II

*Insured Fails To Establish Any Other Basis To Invalidate The Cancellation Notice*

Without addressing the interpretation issue, insured argues there are three reasons to conclude insurance company's cancellation of the 2021 policy was invalid.

First, insured argues the automated nature of insurance company's notices were invalid under the Insurance Code and associated regulations. Insured contends under this law insurance company was required to do "personal outreach … either by phone or a visit to the business location," before insurance company could conclude insured failed to permit the audit. But the issue here is whether the cancellation was proper under Insurance Code section 676.8, which permits cancellation for insured's failure to permit insurance company to audit payroll "as required by the terms of the policy." (Ins. Code, § 676.8, subd. (b)(2).) Insured does not argue the records term, audit terms, and the remainder of the 2021 policy establish the mutual intent of the parties was to require insurance company to conduct personal audits or that automated notifications were improper. (Civ. Code, § 1636 ["A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting"].) We consequently reject this argument.

Second, insured contends the arbitrator "found that [insured] did not refuse to cooperate with a payroll audit by the insurer; this finding is supported by substantial evidence" as "there is no evidence in the record that [insured's owner] refused to cooperate with the audit." But as we have already concluded, the 2021 policy required affirmative action from insured to provide audit records once requested. The intent and motive of insured's representative's unresponsiveness is irrelevant. It does not matter if insured's owner's "lack of response to these communications was intentional or wilful [*sic*]," as insured asserts it does. What matters is whether insured failed to provide payroll records as required by the policy, which resulted in a failure to permit the audit.

12

Finally, insured asserts insurance company "should be equitably estopped from asserting the policy had been canceled" because the February 8, 2022 letter stated the 2021 policy's coverage date was through May 5, 2022. This doctrine is inapplicable. Equitable estoppel enforces a promise detrimentally relied on. (*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 37.) Insured alleges it detrimentally relied by paying the balance due on the invoice. But that is not the harm at issue here, it is the lack of coverage when the employee was injured. And the one letter here that had the incorrect policy ending date was sent on February 8, 2022, after the employee's injury on February 3, 2022. Insured could not have detrimentally relied on the letter to believe it had coverage when the employee was injured before the letter was sent. We therefore also reject this basis for invalidating the cancellation notice.

## DISPOSITION

The order of the Board entered on June 13, 2025, is annulled, and the matter is remanded to the Board for further proceedings consistent with this opinion. Insurance company shall recover its costs in pursuing this petition. (Cal. Rules of Court, rule 8.493(a)(1)(A).)


/s/
ROBIE, J.

We concur:


/s/
HULL, Acting P. J.


/s/
BOULWARE EURIE, J.

13

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT


| | |
|---|---|
| EMPLOYERS PREFERRED INSURANCE COMPANY,<br>        Petitioner,<br><br>        v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and PURCHASE GREEN ARTIFICIAL GRASS,<br>        Respondents. | C104263<br><br>(WCAB Case No. ADJ16338449)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |


ORIGINAL PROCEEDINGS; petition for writ of review from a decision of the Workers' Compensation Appeals Board. Annulled and remanded.

Tobin Lucks and John F. Salisbury for Petitioner.

Allison J. Fairchild for Respondent Workers' Compensation Appeals Board.

Sassano & Fleischer, Matthew Sassano; Law Offices of Kimball J.P. Sargeant, Kimball J.P. Sargeant and Judith A. Carlson for Respondent Purchase Green Artificial Grass.

THE COURT:

The opinion in the above-entitled matter filed on July 14, 2026, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:


/s/
ROBIE, J.



/s/
HULL, Acting P. J.



/s/
BOULWARE EURIE, J.

2